## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JORDAN DAIGLE, *individually and on behalf*
*of all others similarly situated*,

       Plaintiff,

v.                               No. 2:20-cv-652 MLG/KRS

TURNCO ENTERPRISES, LLC, and
DANIEL ROBLES,

       Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on Plaintiffs' Motion for Default Judgment as to Daniel Robles ("Robles") (Doc. 116), and Motion for Default Judgment as to Turnco Enterprises, LLC ("Turnco") (Doc. 141). The two Motions for Default Judgment are referred to collectively as the "Motions." The presiding judge referred the Motions to the undersigned for an evidentiary hearing and to prepare a Proposed Findings and Recommended Disposition on the Motions and the issue of damages. (Docs. 132 and 142). The Court held an evidentiary hearing on February 27, 2025 via Zoom videoconference, at which Plaintiff Jordan Daigle, Opt-In Plaintiffs David Hughes and David Holguin, and their counsel appeared. *See* (Doc. 144) (Clerk's Minutes). Jordan Daigle, David Hughes, and David Holguin will be referred to collectively hereafter as "Plaintiffs." Plaintiffs each testified at the hearing. The exhibits that Plaintiffs proffered (Exhibits 1-6) were entered into the record. The Court also took judicial notice of the Affidavits of each of the Plaintiffs. (Docs. 116-1, 116-2, 116-3 (Affidavits of Jordan Daigle, David Hughes, and David Holguin attached as Exhibits to Motion for Default Judgment as to Daniel Robles) and Docs. 141-1, 141-2 and 141-3 (Affidavits of Jordan Daigle, David Hughes, and David Holguin attached as Exhibits to Motion for Default Judgment as to Turnco Enterprises, LLC)). Opt-In Plaintiff Joe

Lara did not appear at the February 27, 2025 hearing, and Plaintiffs' counsel represented that Joe Lara would withdraw his consent as an Opt-In Plaintiff (Doc. 35-2). Having considered the Motions, the testimony, the Affidavits of each of the Plaintiffs, the statements made by Plaintiffs' counsel at the February 27, 2025 evidentiary hearing, the record of the case, and relevant law, the Court recommends that the Motions **(Docs. 116 and 141)** be **GRANTED** and Plaintiffs be awarded damages as set forth below. The Court further recommends that Opt-In Plaintiff Lara be ordered to withdraw his consent.

### I.    Background.

Plaintiff Jordan Daigle brought this action on behalf of himself and similarly situated individuals to recover unpaid wages, overtime compensation, liquidated damages, attorney's fees, costs, and other damages under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA"), and the New Mexico Minimum Wage Act, N.M. Stat. Ann. §§ 50-4-19 *et seq.* ("NMMWA"). The FLSA claims were brought as a collective action under Section 16(b), 29 U.S.C. § 216(b), while the NMMWA claims were on behalf of a class pursuant to Federal Rule of Civil Procedure 23. The Original Collective/Class Action Complaint ("Complaint") (Doc. 1) alleged that Daigle and the Putative Collective Action/Class Members were current and former Oilfield Workers, who worked for Turnco and Mewbourne Oil Co. ("Mewbourne") anywhere in the United States at any time from July 1, 2017 through the final disposition of the action, and were paid a day rate for each day (and all hours) worked, but did not receive overtime for hours worked over forty (40) each work week. (*Id.*, ¶ 2). According to the Complaint, Defendants misclassified Daigle and the Putative Collective Action/Class Members as independent contractors, and the Putative Collective Action/Class Members "routinely work (and worked) in excess of forty (40) hours per workweek." (*Id.* ¶¶ 3, 4). The Complaint further alleged that Daigle and the Putative Collective Action/Class

Members "did not and currently do not perform work that meets the definition of exempt work under the FLSA or the NMMWA" (*id.* ¶ 8), and that Turnco, an oilfield services company, and Mewbourne, an independent oil and natural gas producer, were "joint employers pursuant to 29 C.F.R. § 791.2" who were "individually and jointly" liable for the alleged violations (*id.* ¶¶ 17, 24, 25, 26).

On August 2, 2020, Turnco and Mewbourne filed answers to the Complaint (Docs. 13, 15), and, on March 9, 2021, the Court granted Daigle's unopposed motion for conditional class certification. (Doc. 33). Thereafter, Consents to Join in the collective action pursuant to 29 U.S.C. § 216(b) were filed by Jerome Holguin (Doc. 35-1), John Lara (Doc. 35-2), and David Hughes (Doc. 36-1).

In July 2021, the parties sought and were granted a stay of proceedings to allow exploration of an early settlement (Docs. 39, 40), with the parties announcing that a settlement had been reached in April 2022 (Doc. 50). In June 2022, Plaintiffs filed an Unopposed Motion To Approve FLSA Settlement and Attorneys' Fees and Costs (Doc. 55), to which they attached a Settlement Agreement and Release of Claims ("Settlement Agreement") (Doc. 55-1), executed on Turnco's behalf by Robles (who was not yet named as an individual defendant in the case) and the attorney who was representing Turnco at the time. The Settlement Agreement was between Plaintiffs and Turnco, and was to be effective as of "the date by which [the Agreement] is approved by the Court." Although Mewbourne was not a named party or signatory to the Settlement Agreement, the Agreement purported to release Plaintiffs' claims against both Turnco and Mewbourne.

On August 5, 2022, the presiding judge at that time entered an order finding that the Settlement Agreement did not require court approval,[1] and ordering the parties "to file a Joint Notice of Dismissal, unless the Parties wish[ed] for the Court to review the merits of the Settlement." (Doc. 57 at 5). On August 10, 2022, Plaintiffs filed a notice of their intent to file a joint stipulation of dismissal with prejudice upon complete performance of the obligations in the Settlement Agreement, and in the meantime sought and were granted a stay of proceedings. *See* (Docs. 59, 60).

In their August 10, 2022 notice, as well as in several filings thereafter, Plaintiffs stated that they and Turnco considered the effective date of the Settlement Agreement to be August 5, 2022 based on the Court's order of that date finding that the agreement did not need court approval.[2] Then, on January 26, 2023, Plaintiffs filed a Motion to Enforce the Settlement Agreement, stating that Turnco was in material breach of the Agreement having failed to make the required payments. (Doc. 68).[3] Turnco did not file a timely (or any) response to the Motion to Enforce, and, in the meantime, the current presiding judge set the matter for a status conference on the Motion to

---

[1] *See* (Doc. 57 at 5 (noting that the Settlement Agreement binds only the FLSA Collective Members 'who cash or otherwise negotiate their settlement checks'" and citing authority for the principle that "a settlement agreement reached under circumstances like those here did not require judicial approval")).

[2] The case was subsequently reassigned to a different trial judge, who entered an order on January 24, 2023 approving the Settlement Agreement without mentioning the previous order finding that court approval was not necessary. (Doc. 67). Plaintiffs, however, continued to maintain in court filings that the Agreement took effect on August 5, 2022.

[3] Plaintiffs contended that Turnco's initial payment under the Settlement Agreement had been due October 4, 2022 (one month after the August 5, 2022 effective date), and thereafter Turnco was obligated to make six (6) monthly installment payments, with the final installment due April 2, 2023. As of the filing of the motion to enforce in January 2023, Turnco had not made any of the settlement payments as agreed. (Doc. 70).

Enforce. Before the date of that status conference, however, Turnco's counsel filed a motion to withdraw, asserting lack of communication from his client as the basis for the motion. (Doc. 78).

On August 29, 2023, the Court held a status conference and hearing (Doc. 80 (Clerk's Minutes)), following which it granted Turnco's counsels' motions to withdraw (Docs. 78, 81, 83, 84). On September 11, 2023, the Court entered an Order to Show Cause (Doc. 85), noting that Turnco had been unresponsive to communications from its attorneys and court filings, and informing Turnco that a corporate entity cannot represent itself in court. The Court warned Turnco that a default judgment could be entered against it if it did not retain counsel as directed in the Show Cause Order. Two days later, however, the Court issued another order sua sponte in which it stated that it had discovered from public records that Turnco had ceased operating in February 2023, and that it had filed for bankruptcy in April 2023. (Doc. 86). As a result of these circumstances, the Court entered orders in September 2023 and October 2023 recognizing the automatic bankruptcy stay as to Plaintiffs' claims against Turnco, denying Plaintiffs' Motion to Enforce Settlement Agreement without prejudice, and directing the remaining parties (Plaintiffs and Mewbourne) to proceed with the litigation. (Docs. 87, 93).

Turnco's bankruptcy petition was dismissed without any discharge on November 20, 2023, and the bankruptcy proceeding closed on December 15, 2023. (Doc. 103). On January 8, 2024, Plaintiffs filed the currently operative First Amended Collective/Class Action Complaint ("Amended Complaint") (Doc. 104), which named Robles, the alleged owner and president of Turnco, as an additional defendant. Robles was served with the Amended Complaint on January 1, 2024 (Doc. 106, 108), but never filed an answer or any other response. The Clerk entered default against Robles on March 4, 2024 (Doc. 113), and Plaintiffs filed their Motion for Default Judgment against Robles on March 25, 2024 (Doc. 116).

Thereafter, Plaintiffs and Mewbourne settled their dispute, and Mewbourne was dismissed as a defendant on July 15, 2024 (Doc. 125, 126). On January 16, 2025, the undersigned held a status conference to schedule an evidentiary hearing on Plaintiffs' Motion for Default Judgment against Defendant Robles, at which time the Court also cautioned Plaintiffs that, since the automatic bankruptcy stay had expired in December 2023, Plaintiffs' claims against Turnco could be dismissed for failure to prosecute unless they took action on those claims in the near future. Plaintiffs then moved for entry of default against Turnco, which the Clerk entered on February 13, 2025. (Docs. 138, 140). Plaintiffs filed their Motion for Default Judgment Against Turnco on February 18, 2025. (Doc. 141).

## II.    Legal Standard

Federal Rule of Civil Procedure 55 "mandates a two-step process for a party who seeks a default judgment in his favor." *Williams v. Smithson*, 57 F.3d 108, 1995 WL 365988, at *1 (10th Cir. 1995) (unpublished). First, the party must obtain a Clerk's entry of default. *See* FED. R. CIV. P. 55(a); *see also Watkins v. Donnelly*, 551 Fed. Appx. 953, 958 (10th Cir. 2014) (unpublished) ("Entry of default by the clerk is a necessary prerequisite that must be performed before a district court is permitted to issue a default judgment."). After obtaining a Clerk's entry of default, the party may move the Clerk to enter a default judgment if the claim is for a "sum certain," but "in all other cases, the party must apply to the court for a default judgment." FED. R. CIV. P. 55(b)(1)-(2).

In considering whether to grant a motion for default judgment, a court should first determine: (1) whether it has subject matter jurisdiction over the dispute; and (2) whether it has personal jurisdiction over the defaulting party by determining whether the party against whom a default judgment is sought has been properly served in accordance with the Federal Rules of Civil

Procedure and subsequently failed to answer, defend, or otherwise appear in the case within the time provided by the Rules. *See Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010) ("Personal jurisdiction over the defendant is required before a default judgment in a civil case may be entered.") (citation omitted); *Dennis Garberg & Assoc., Inc. v. Pack-Tech Intern. Corp.*, 115 F.3d 767, 771-72 (10th Cir. 1997) ("[J]udgment by default should not be entered without a determination that the court has jurisdiction over the defendant."); *Williams v. Life Savings and Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986) ("Thus, when entry of a default judgment is sought against a party who has failed to plead or otherwise defend, *the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties*." (emphasis in original)).

In reviewing a motion for default judgment, courts should accept all factual allegations in the complaint as true, except those pertaining to the amount of damages. *Archer v. Eiland*, 64 Fed. Appx. 676, 679 (10th Cir. 2003) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2688 at 58–59 (3d ed. 1998)); *see also United States v. Craighead*, 176 Fed. Appx. 922, 924 (10th Cir. 2006) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established."). However, courts must also determine "whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law. *Bixler*, 596 F.3d at 762.

### III. Discussion

#### a. Entry of Default

Plaintiffs have met the first step of Rule 55 by obtaining a Clerk's Entry of Default after Defendants Robles and Turnco defaulted. *See* (Docs. 109 and 113) (Plaintiffs' Motion for Entry

of Default against Daniel Robles and Clerk's Entry of Default) and (Docs 138 and 140) (Plaintiffs'

Motion for Entry of Default against Turnco Enterprises, LLC and Clerk's Entry of Default)).

Defendant Robles never entered an appearance in the case so "there is no question here that [he]

w[as] in default." *Archer*, 64 Fed. Appx. at 679. Turnco, on the other hand, appeared in the case

and actually defended the suit through execution of the Settlement Agreement. The automatic

bankruptcy stay then prevented Plaintiffs from proceeding with their claims against Turnco until

the stay expired upon the bankruptcy court's dismissal of those proceedings.[4] After the stay

expired, however, Turnco failed to appear through counsel or otherwise respond to various filings

and court notices. As Plaintiffs argued in their Motion for Entry of Default:

> Defendant Turnco, as a corporate entity, is required to obtain proper
> legal representation under D.N.M. LR-Civ. 83.7. Turnco has failed
> to retain counsel following its previous attorney's withdrawal,
> leaving it unable to defend itself in this matter. Defendant Turnco
> has failed to comply with the Court's Orders (ECF Nos. 85-87),
> including directives to retain counsel and actively participate in
> these proceedings. Defendant Turnco has abandoned its defense by
> failing to comply with court orders, obtain legal representation, and
> participate in required litigation activities. Given these failures,
> Turnco has effectively ceased defending itself in this case.

(Doc. 138 at 1-2). "[B]y answering the [original] [C]omplaint and then failing to defend against it,

[Turnco] defaulted[.]" *Tripodi v. Welch*, 810 F.3d 761, 764–65 (10th Cir. 2016) (citing *Ackra*

*Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 854–56 (8th Cir. 1996) (upholding default

judgment against defendants who initially appeared through counsel and then did not participate

in the case after their counsel withdrew))).

---

[4] *See* 11 USC 362(c)(2) ("the stay of any other act under subsection (a) of this section continues
until the earliest of--(A) the time the case is closed; (B) the time the case is dismissed; or (C) if the
case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11,
12, or 13 of this title, the time a discharge is granted or denied").

### b.    Jurisdiction

The Court has Federal Question subject matter jurisdiction under 28 U.S.C. § 1331, which provides that federal courts have "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." The Court has supplemental jurisdiction over the additional state law claims under 28 U.S.C. § 1367.

Further, this Court has personal jurisdiction over Defendants. In determining whether a federal court has personal jurisdiction over a defendant, the Court must determine (1) whether Defendants were properly served with process, and (2) "whether the exercise of jurisdiction comports with due process." *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006).

First, service of process on both defendants was proper: (1) Robles was personally served with a summons and complaint on January 22, 2024 at 5708 County Road 7550, Lubbock, Texas 79425. (Docs. 106 and 108) (Affidavit of Service and Summons Return);[5] (2) Turnco was served with process on July 18, 2020 by delivery of a summons and complaint to its registered agent, Albert Robles, at 1207 N. 1st Street, Lovington, Lea County, New Mexico 88260. (Doc. 7) (Return of Summons and Affidavit of Service).[6]

Second, "[b]ecause [the FLSA] does not, by itself, confer nationwide service of process or jurisdiction upon federal district courts to adjudicate claims, Fed. R. Civ. P. 4(k)(1)(A) refers [the Court] to the New Mexico long-arm statute" for determining whether this Court may assert personal jurisdiction over Defendants. *Trujillo*, 465 F.3d at 1217 (internal quotation marks,

---

[5] *See* FED. R. CIV. P. 4(e)(2)(A) (providing for service of process by "delivering a copy of the summons and of the complaint to the individual personally").

[6] *See* FED. R. CIV. P. 4(e)(2)(C) (providing for service of process by "delivering a copy of each to an agent authorized by appointment or by law to receive service of process").

citations, and footnote omitted); *see* FED. R. CIV. P. 4(k)(1)(A) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"). "[T]he New Mexico long-arm statute is coextensive with constitutional limitations imposed by the Due Process Clause." *Trujillo*, 465 F.3d at 1217; *see also Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,* 514 F.3d 1063, 1070 (10th Cir. 2008) (explaining that, where the state long-arm statute is coextensive with federal due process, the first, statutory, inquiry under Rule 4(k)(1)(A) "effectively collapses into the second, constitutional, analysis"). "[T]o exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'" *Dudnikov,* 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted)); *see also Dennis Garberg & Assocs., Inc*., 115 F.3d at 773.

The Court finds that Defendants have minimum contacts with New Mexico such that having to defend a lawsuit here would not "offend traditional notions of fair play and substantial justice" because Plaintiffs' causes of action arose in New Mexico as a result of Defendants' conduct within the state. *See* (Doc. 104 ¶ 23 (Plaintiff Daigle worked in Malaga, New Mexico throughout his employment with Defendants"); Doc. 116-2 ¶ 4 (Hughes Affidavit) ("I worked at Mewbourne's wellsites in New Mexico."); Doc. 116-3 ¶ 4 (Holquin Affidavit) (same)). Accordingly, the assertion of personal jurisdiction over Defendants in this matter comports with Due Process, and is thereby authorized by the New Mexico long-arm statute.[7]

---

[7] The Court also finds that Turnco waived any right to contest personal jurisdiction when it appeared and defended in the case. *See Trujillo*, 465 F.3d at 1217 ("lack of personal jurisdiction and venue represent defenses that, similar to affirmative defenses, can be waived if not properly

c.    **Threshold Discretionary Issue**

The decision whether to enter a default judgment is ultimately at the court's discretion. *Dennis Garber & Assocs., Inc.*, 115 F.3d at 77. Accordingly, a threshold question before reaching liability or damages is whether Defendants' conduct is sufficient to warrant default judgment being entered. In determining whether to enter a default judgment, the Court is guided by the same factors that apply to a motion to set aside entry of a default. *See Pecarsky v. Galaxiworld.com, Ltd.*, 249 F.3d 167, 170-71 (2d Cir. 2001). These factors are "1) whether the defendant's default was willful; 2) whether the defendant has a meritorious defense to plaintiff's claims; and 3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Mason Tenders Dist. Council v. Duce Constr. Corp.*, No. 02-CV-9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003); *see Derma Pen, LLC v. 4EverYoung Ltd.*, 736 Fed. Appx. 741, 745 (10th Cir. 2018) ("Since a default judgment, like dismissal, represents an extreme sanction, it is appropriate only in cases of willful misconduct. A 'willful failure' is any intentional failure as distinguished from involuntary noncompliance. But [n]o wrongful intent need be shown." (internal quotation marks and citations omitted)).

Courts disfavor default judgments, and instead prefer to adjudicate cases on their merits. *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990). As such, default judgment must be "viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Cessna Fin. Corp. v. Bielenberg Masonry Contracting Inc.*, 715 F.2d 1442, 1444 (10th Cir. 1983). Defendants' failure to respond to the Amended Complaint

raised, *see* Fed. R. Civ. P. 12(h)(1)"); *cf. Dennis Garber & Assocs., Inc.,* 115 F.3d at 772 ("Defects in personal jurisdiction, however, are not waived by default when a party fails to appear or to respond.").

demonstrates the default was willful. *See, e.g., Indymac Bank v. Nat'l Settlement Agency, Inc.,* No. 07-CV-6865, 2007 WL 4468652, at * 1 (S.D.N.Y. Dec. 20, 2007). They had sufficient notice of the present litigation. Both were properly served with a summons and the Amended Complaint. Notwithstanding this notice and service, Defendants did not respond to the Amended Complaint, did not appear, and have not in any way attempted to defend themselves. There is nothing in the record to suggest that Defendants have a triable defense as to liability; specifically, there is no evidence Defendants were exempt from paying overtime. It is evident from the record before the Court that Plaintiffs have suffered quantifiable harm, and that they will continue to do so absent the entry of default judgment. Plaintiffs also would be denied the right to judicial resolution of the claims presented, and would be without other recourse for recovery absent the entry of a default judgment. Because Defendants have failed to respond to or defend this action in any way, the Court recommends that a finding of default judgment is appropriate under the circumstances. *See, e.g., Tabb v. Mentor Prot. Serv. LLC,* No. CIV-17-1130-D, 2018 WL 3213622, at *1–3 (W.D. Okla. June 29, 2018).

### d.    Legal Sufficiency of the Amended Complaint

Once a district court concludes that it has the power to enter a default judgment against a defendant, and that it should exercise its discretion to do so if the conditions for entering default judgment are satisfied, the court next must determine whether the well-pleaded allegations of the complaint, if true, state a claim for relief. *Nev. Gen. Ins. Co. v. Anaya,* 326 F.R.D. 685, 693 (D.N.M. 2018). A district court reviewing a motion for default judgment accepts as true all well-pleaded allegations in a complaint, except those related to indefinite or uncertain damages. *See Craighead,* 176 Fed. Appx. at 925. "After a default judgment is handed down, a defendant admits

to a complaint's well-pleaded facts and forfeits his or her ability to contest those facts." *Tripodi,* 810 F.3d at 764.

Accepting the well-pleaded allegations in the Amended Complaint as true and for the reasons stated below, the Court finds that the allegations support entry of a default judgment. The FLSA requires overtime pay of one and a half times an employee's hourly wage for every hour worked over forty hours in a week. *See* 29 U.S.C. § 207(a)(1). An employee bringing an action for unpaid overtime compensation must demonstrate: (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's overtime wage requirements; and (4) the amount of overtime compensation due. 29 U.S.C. § 207(a); *see Tabb*, 2018 WL 3213622, at *1–3 (citing *Johnson v. Heckmann Water Res. (CVR), Inc*., 758 F.3d 627, 630 (5th Cir. 2014); and *Figueroa v. Dist. of Columbia Metro. Police Dep't*, 633 F.3d 1129, 1134-35 (D.C. Cir. 2011) ("[A]n employee has carried out his burden [in an FLSA action] if he proves that he has in fact performed work for which he was improperly compensated.") (quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687 (1946) (paraphrasing in original)))).

The FLSA defines "employer" for purposes of the first requirement broadly:

> "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

29 U.S.C. § 203. "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship." *Saavedra v. Lowe's Home Ctrs., Inc.,* 748 F. Supp. 2d 1273, 1285 (D.N.M. 2010) (quoting *Goldberg v. Whitaker House Coop., Inc*., 366 U.S. 28, 33, (1961)). The Supreme Court has instructed courts to construe the terms "employer"

and "employee" expansively under the FLSA. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). The Tenth Circuit has similarly recognized that "[t]he terms 'employee' and 'employer' are given ... broad ... definitions." *Johnson v. Unified Gov't of Wyandotte Cnty.*, 371 F.3d 723, 729 (10th Cir. 2004).

> The statute is a remedial one, written in the broadest possible terms.... It runs counter to the breadth of the statute and to the Congressional intent to impose a qualification which permits an employer who exercises substantial control over a worker, but whose hiring decisions occasionally may be subjected to a third party's veto, to escape compliance with the Act.

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). Thus, "[e]mployer" includes persons or entities who have "managerial responsibilities" that give the person or entity "substantial control of the terms and conditions of the work of [its] employees." *Falk v. Brennan*, 414 U.S. 190, 195, (1973). "Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA." *Saavedra*, 748 F. Supp. 2d at 1288 (citing *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)); *see Corman v. JWS of N.M., Inc.*, 356 F. Supp. 3d 1148, 1178–79 (D.N.M. 2018) (citing additional cases).

The second requirement, that the employee engaged in activities within the coverage of the FLSA, is met either by the *employee* being "engaged in commerce or in the production of goods for commerce" ("individual coverage"), or by the employee being "*employed in an enterprise* engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). *See* 29 U.S.C. §§ 206(a), 207(a)(1) (emphasis added); *Payamps v. M&M Convenience Deli & Grocery Corp.*, 16-CV-4895-LDH-SJB, 2018 WL 3742696, at * 2 (E.D.N.Y. May 18, 2028); *see also Hernandez v. Little K's Landscaping, LLC,* No. 3:23-CV-00460 (SVN), 2023 WL 11964307, at *1 (D. Conn. July 24, 2023) ("To recover under that statute, plaintiffs must show that their

employment is sufficiently connected to interstate commerce under either the 'individual' or 'enterprise' theories."). "Employees are 'engaged in commerce' within the meaning of [FLSA] when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." 29 C.F.R. § 779.103. "[T]his includes every employee employed in the channels of such commerce or in activities so closely related to this commerce, as to be considered a part of it as a practical matter." *Id.*

The legal requirements for Plaintiffs' state law claims under the NMMWA are similar. According to the NMMWA, an "employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours." *Gandy v. RWLS, LLC*, 308 F. Supp. 3d 1220, 1223 (D.N.M. 2018) (quoting N.M. Stat. Ann. § 50–4–22(D)). "The NMMWA 'establishes a floor below which employers cannot pay employees wages and also requires the payment of time and a half for work in excess of a forty-hour workweek.'" *Id.* (quoting *Armijo v. Wal–Mart Stores, Inc*., 142 N.M. 557, 168 P.3d 129 (2007) (quotations omitted)).

Turning to Plaintiffs' Amended Complaint, by virtue of their default Defendants admit the following factual allegations:

- **Plaintiffs worked over 40 hours per week but were not paid at the overtime rate for hours in excess of 40.**

As former Oilfield Workers who worked for Defendants in New Mexico, Plaintiffs were paid a day rate for each day (and all hours) worked, but did not receive overtime for all hours worked over forty (40) in each workweek. (Doc. 104 ¶ 2). Plaintiffs routinely worked in excess of forty (40) hours per workweek, but were not paid overtime of at least one and one-half their regular rates for all hours worked in excess of forty (40) hours per workweek. (*Id.* ¶¶ 4, 5, 78). Plaintiffs

did not perform work that meets the definition of exempt work under the FLSA or the NMMWA. Specifically, Plaintiffs did not earn a salary thereby nullifying any "salary-based" exemption. (*Id.* ¶¶ 8, 88); *see also* (*id.* ¶ 125 (Plaintiffs "have not been exempt from receiving overtime benefits under the NMMWA")).[8]

- **Defendants Jointly Employed Plaintiffs.**

Defendant Turnco is an oilfield staffing/consulting company that supplied oilfield workers, like Plaintiffs, to work for oilfield companies, such as Mewbourne at Mewbourne's wellsites. Turnco employed and/or jointly employed Plaintiffs. (Doc. 104 ¶¶ 15, 28). Defendant Robles is the Owner and President of Turnco. Robles exerted operational control over Turnco, managed Turnco's key internal relationships, and dictated the practice goals and what pressing or tactical items needed to be done to meet the goals of Turnco and its clients. Robles employed and/or jointly employed Plaintiffs. (*Id.* ¶¶ 17, 29, 30). Defendants maintained control, oversight, and direction over Plaintiffs, including the promulgation and enforcement of policies affecting the payment of wages for overtime compensation. While Mewbourne controlled the details of Plaintiffs' daily work and schedule, Turnco and/or Robles distributed the pay to Plaintiffs. (*Id.* ¶¶ 31-32). Defendants maintained Plaintiff Daigle's employment records, including pay records, invoices, and other documents related to his work on their computer systems and in their paper files. Defendants mutually benefitted from the work performed by Plaintiffs; they did not act entirely independently of each other and have not been completely disassociated with respect to the work

---

[8] The FLSA specifically exempts certain other employee categories, such an "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act." 29 U.S.C. § 213(b)(3). An exemption under the FLSA, however, "is a matter of affirmative defense," which the employer must plead and prove. *See Acevedo v. Sw. Airlines Co.*, No. CV 16-24 MV/LF, 2018 WL 2392215, at *4 (D.N.M. May 25, 2018). Accordingly, Plaintiffs need not prove their non-exempt status.

of Plaintiffs; they shared the services of Plaintiffs, and acted directly or indirectly in the interest of each other in relation to Plaintiffs. (*Id.* ¶¶ 35-39). Defendants are joint employers pursuant to 29 C.F.R. § 791.2. They have (or had) common ownership, oversight, and control over Plaintiffs. In short, during the relevant period, Defendants individually and collectively have been Plaintiffs' joint "employer" under 29 U.S.C. § 203(d). (*Id.* ¶¶ 18, 40, 83).

- **Plaintiffs Were Defendants' Employees—Not Independent Contractors.**

Plaintiff Daigle worked exclusively for Mewbourne through Turnco and Robles in the relevant time period. (Doc. 104 ¶ 44). Plaintiffs' primary job duties included general frac, flowback, and drill-out support for Defendants' clients' well sites. (*Id.* ¶ 47). Plaintiffs would conduct their day-to-day activities within mandatory and designed parameters and in accordance with pre-determined operational plans created by Defendants; their daily and weekly activities were routine and largely governed by standardized plans, procedures, and checklists created by Defendants; and virtually every job function was pre-determined by Defendants, including Plaintiffs' schedule of work and related work duties. (*Id.* ¶¶ 48-50). Plaintiffs were prohibited from varying their job duties outside of the predetermined parameters. (*Id.* ¶ 51). Plaintiffs relied on their hands, physical skills, and energy to perform manual and routine labor in the oilfield. (*Id.* ¶ 52).

Defendants (i) set Plaintiffs' pay and controlled the number of days (and hours) they worked, (ii) set all employment-related policies applicable to Plaintiffs, (iii) maintained control over pricing and marketing, (iii) chose equipment and product suppliers, (iv) owned or controlled the equipment and supplies that Plaintiffs used to perform their work, (v) had the power hire and fire Plaintiffs, (vi) made all personnel and payroll decisions with respect to Plaintiffs, (vii) reimbursed Plaintiffs for expenses and bought or provided tools and equipment that Plaintiffs used;

(viii) made the necessary large capital investments in vehicles, buildings, equipment, tools, and supplies, and (ix) paid operating expenses like rent, payroll, marketing, insurance, and bills. (*Id.* ¶¶ 55-62, 65-66).

Plaintiffs (i) did not employ their own workers, (ii) worked continuously for Defendants on a permanent full-time basis, (iii) relied on Defendants for their work; (iv) did not market any business or services of their own; (v) worked the hours assigned by Defendants, performed duties assigned by Defendants, worked on projects assigned by Defendants, and worked for the benefit of Defendants and their customers, and (vi) did not earn a profit based on any business investment of their own. (*Id.* ¶¶ 63-64, 67-69, 71). Plaintiffs' only earning opportunity was based on the number of days they were allowed to work, which was controlled by Defendants and/or their customers. (*Id.* ¶ 72). Defendants improperly classified Plaintiffs as independent contractors, because Plaintiffs were not in business for themselves and were economically dependent upon Defendants for their work. (*Id.* ¶¶ 73-75); *see also* (*id.* ¶ 88 (Plaintiffs were "***non-exempt*** employees who worked for Defendants and were engaged in oilfield services that were directly essential to the production of goods for Defendants and related oil and gas exploration and production companies. 29 U.S.C. § 203(j)"); *id.* ¶ 89 (Plaintiffs were "individual employees who were engaged in commerce or in the production of goods for commerce"); *id.* ¶¶ 121-122 (Defendants were employers and Plaintiffs were employees within the meaning of the NMMWA).

- **Defendants are subject to the FLSA**

The Amended Complaint alleges that Defendants have been enterprises engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprises have had, and have, employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or

otherwise working on goods or materials that have been moved in or produced for commerce by any person, or in any closely related process or occupation directly essential to the production thereof, and in that those enterprises have had, and have, an annual gross volume of sales made or business done of not less than $500,000.00 (exclusive of excise taxes at the retail level which are separately stated). (Doc. 104 ¶ 85). Plaintiffs provided services for Defendants that involved interstate commerce for purposes of the FLSA. (*Id.* ¶ 86). In performing the work described in the Amended Complaint, Plaintiffs "were engaged in commerce or in the production of goods for commerce within the meaning of §§ 203(b), 203(i), 203(j), 206(a), and 207(a) of the FLSA. 29 U.S.C. §§ 203(b), 203(i), 203(j), 206(a), 207(a)." (*Id.* ¶ 87).

### e.    Additional Factual Findings

In addition to the Amended Complaint's factual allegations, Plaintiffs provided sworn testimony in their Affidavits and at the February 27, 2025 hearing. Based on Plaintiffs' testimony, the Court recommends the following additional findings of fact:

### **<u>Testimony of Jordan Daigle</u>**

1.    Plaintiff Daigle was hired by Turnco and Robles to work for Mewbourne in the oilfield. His specific title was Flowback Operator. As a Flowback Operator, Daigle monitored or facilitated saltwater flowback operations at Mewbourne's saltwater wells.

2.    Turnco is a staffing/consulting firm that is owned and operated by Robles. Turnco and Robles supplied oil field workers, like Daigle, to work for oil field companies, such as Mewbourne.

3.    Daigle worked exclusively and continuously for Turnco and Robles from approximately August 2018 until approximately February 2020 at Mewbourne's well sites in New Mexico.

4.      Defendants hired Daigle and other oilfield workers to work at Mewbourne's wellsites. Daigle knew this because he worked alongside many other oilfield workers hired by Defendants to work at Mewbourne's saltwater wells.

5.      Daigle was not paid any overtime. He did not negotiate the day rate amount.

6.      Daigle was told he would be paid a day rate regardless of the number of hours he worked each day.

7.      Daigle was paid by Defendants and was not paid for days he did not work.

8.      Defendants could (and did) adjust Daigle's compensation unilaterally. For instance, in approximately July 2019, Daigle asked for a raise and in response, he was threatened with termination. After this, Daigle never brought up the issue of a raise again. In approximately December 2019, Defendants unilaterally decided to raise Daigle's day rate from $576.00 to $624.00.

9.      Defendants misclassified Daigle as an independent contractor.

10.     Defendants controlled and set Daigle's work schedule and conditions of employment.

11.     Defendants set the days Daigle was required to work and set his work schedule. Daigle typically was scheduled to, and did, work three weeks on, or a three week "hitch." During his hitch, Daigle lived at an assigned Mewbourne well site, and was required to stay on site twenty-four hours a day. If Daigle needed to go to the doctor or wanted to take a family vacation, he had to get approval from Defendants.

12.     Although Daigle regularly worked in excess of forty (40) hours per week, he was not paid the overtime premium for all hours worked in excess of forty (40) hours in a work week.

Defendants did not pay Daigle overtime at a rate of one and one-half his regular rate. Instead, Defendants paid Daigle at his day rate regardless of the number of hours he worked.

13.    During Daigle's employment with Defendants, Daigle did not control or have authority over other employees, or his own, work schedules, rates of compensation, or changes of employment status.

14.    Daigle did not have discretion as to which tasks he would perform or how he would complete each task. Defendants dictated which tasks he worked on and specifically directed how that task would be completed in the standard operating procedures.

15.    Daigle was also paid $40 per day for trailer rental.

16.    While working for Defendants, Daigle did not have any additional business income, nor did he work for any other companies during his employment with Defendants. Daigle understood that working for another company was not allowed, and that he would be terminated if he sought additional work and/ or compensation from other companies.

### <u>Testimony of David Hughes</u>

17.    David Hughes submitted a signed consent form to join this action on June 9, 2021. (Doc. 36-1).

18.    Hughes was hired by Defendants to work for Mewbourne in the oilfield. His title was Well Tester/Flowback Operator. As a Well Tester/Flowback Operator for Defendants, Hughes monitored or facilitated saltwater flowback operations at Mewbourne's saltwater wells.

19.    Turnco is a staffing/consulting firm that is owned and operated by Robles. Turnco and Robles supplied oilfield workers, like Hughes, to work for oilfield companies, such as Mewbourne.

20.     Hughes worked exclusively and continuously for Defendants from approximately December 17, 2019 until March 24, 2020.

21.     Defendants hired Hughes and other Oilfield Workers to work at Mewbourne's well sites. Hughes knew this because he worked alongside many other oilfield workers hired by Defendants to work at Mewbourne's saltwater wells.

22.     Hughes was paid a set amount per day. Hughes did not negotiate his day rate amount. Defendants could (and did) adjust Hughes compensation unilaterally.

23.     Hughes was paid by Defendants and was not paid for days he did not work.

**24.**     Defendants did not pay Hughes overtime at a rate of one-half my regular rate. Instead, Defendants paid Hughes his regular rate regardless of the number of hours he worked.

25.     Hughes thought that he was misclassified by Defendants as an independent contractor.

26.     Defendants controlled and set Hughes work schedule and conditions of employment.

27.     Defendants set the days Hughes was required to work and set his work schedule. Hughes typically was scheduled to, and did, work seven days a week. Hughes lived at an assigned Mewbourne well site and was required to stay on site twenty-four hours a day. If Hughes needed to go to the doctor or wanted to take a family vacation, he had to get approval from Defendants.

28.     During Hughes employment with Defendants, he did not control or have authority over other employees, or his own, work schedules, rates of compensation, or changes of employment status.

29.     Hughes did not have discretion as to which task he would perform or how he would complete each task. Defendants dictated that tasks that Hughes worked on and specifically directed how that task would be completed in the standard operating procedures.

30.     While working for Defendants, Hughes did not have any additional business income, nor did he work for any other companies during his employment with Defendants. Hughes understood that working for another company was not allowed, and that he would be terminated if he sought additional work and/or compensation from other companies.

### Testimony of Jerome Holguin

31.     Holguin submitted a signed consent form to join this action on March 30, 2021. (Doc. 35-1).

32.     Holguin was hired by Defendants to work for Mewbourne Oil Co. in the oilfield. His specific title was Flowback Operator. As a Flowback Operator for Defendants, Holguin monitored or facilitated saltwater flowback operations at Mewbourne's saltwater wells.

33.     Turnco is a staffing/consulting firm that is owned and operated by Robles. Turnco and Robles supplied oilfield workers, like Holguin, to work for oilfield companies, such as Mewbourne.

34.     Holguin worked exclusively and continuously for Defendants from approximately October 31, 2018 until April 2, 2019. Holguin worked at Mewbourne's well sites in New Mexico.

35.     Defendants hired Holguin and other Oilfield Workers to work at Mewbourne's well sites. Holguin know this because he worked alongside many other oilfield workers hired by Defendants to work at Mewbourne's saltwater wells.

36.     Holguin did not negotiate his daily rate amount. Defendants could (and did) adjust Holguin's compensation unilaterally.

37.     Although Holguin regularly worked in excess of forty (40) hours per week, Defendants did not pay the overtime premium for all hours worked in excess of forty (40) hours in a workweek.

38.     Defendants did not pay the overtime premium for all hours Holguin worked in excess of forty (40) hours in a work week. Defendants did not pay Holguin overtime at a rate of one-half his regular rate. Instead, Defendants paid Holguin his regular rate regardless of the number of hours he worked.

39.     Holguin believes he was misclassified by Defendants as an independent contractor.

40.     Holguin was paid by Defendants. Holguin was not paid for days he did not work.

41.     Defendants did not pay Holguin overtime at a rate of one-half his regular rate. Instead, Defendants paid Holguin his regular rate regardless of the number of hours he worked.

42.     Defendants controlled and set Holguin's work schedule and conditions of employment.

43.     Defendants set the days Holguin was required to work and set his work schedule. Holguin typically was scheduled to, and did, work seven days a week. Holguin lived at an assigned Mewbourne well site and was required to stay on site twenty-four hours a day. If Holguin needed to go to the doctor or wanted to take a family vacation, he had to get approval from Defendants.

44.     Holguin did not have discretion as to which task he would perform or how he would complete each task. Defendants dictated the tasks that he worked on and specifically directed how that task would be completed in the standard operating procedures.

45.     During Holguin's employment with Defendants, he did not control or have authority over other employees, or his own, work schedules, rates of compensation, or changes of employment status.

46.     While working for Defendants, Holguin did not have any additional business income, nor did he work for any other companies during his employment with Defendants. Holguin understood that working for another company was not allowed, and that he would be terminated if he sought additional work and/ or compensation from other companies.

Based upon the above testimony, in addition to the allegations contained in the First Amended Complaint, the Court concludes and recommends that Plaintiffs have established they are entitled to recover for their claims made pursuant to the FLSA and the NMMWA.

### f.    Damages

Next, the Court considers damages. "[D]efault judgment may not be entered until the amount of damages has been ascertained." *Reg. Dist. Council v. Mile High Rodbusters, Inc.*, 82 F. Supp. 3d 1235, 1243 (D. Colo. 2015) (citing *Herzfeld v. Parker*, 100 F.R.D. 770, 773 (D. Colo. 1984)). "The calculation of damages requires the Court to look beyond the averments of the complaint. The Court is required to examine the sufficiency of all evidence with respect to damages, and, when evidence is deemed insufficient, to ascertain the appropriate level of damages through its own inquiry." *Begay v. Rangel*, No. CIV 05-0494 MCA/LCS, 2006 WL 8444385, *2 (D.N.M. Mar. 10, 2006). Further, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c).

"Under the FLSA, an employer must pay its employees for the time that it 'employ[s]' them, the statutory definition of which means 'to suffer or permit to work.'" *Corman*, 356 F. Supp. 3d at 1179 (quoting 29 U.S.C. § 203(g)); *see* 29 C.F.R. § 785.6 ("By statutory definition the term 'employ' includes (section 3(g)) 'to suffer or permit to work.' The act, however, contains no definition of 'work.'").

"The employee bears the burden of proving he performed work for which he was not properly compensated." *Corman*, 356 F. Supp. 3d at 1180 (quoting *Donovan*, 725 F.2d at 85). "An employee carries his burden by proving that he has 'in fact performed work for which he was improperly compensated and ... [producing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.' Upon such a showing, the burden shifts to the employer to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference drawn from the employee's evidence." *Id.* (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "If the employer does not rebut the employee's evidence, then damages may be awarded even though the result is only approximate. The employer cannot complain that the damages lack the precision that would have been possible if the employer had kept the records required by law." *Id.* (citing *Anderson*).

"Because the FLSA does not put a limit 'on the number of hours that an employee may work in any workweek, he may work as many hours a week as he and his employer see fit, [but, the employer must pay] the required overtime compensation ... for hours worked in excess of the maximum workweek prescribed by section 7(a).'" *Id.* at 1181 (quoting 29 C.F.R. § 778.102). "[T]he employee must receive overtime pay at a rate of no less than one and one-half times the 'regular rate' for which the employer employs the employee. The Supreme Court described 'the regular rate' as 'the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed.'" *Id.* (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)); *see* 29 C.F.R. § 778.108.

Actions to enforce the FLSA's overtime provisions are generally subject to a two-year statute of limitations unless the violation is willful, in which case the limitations period is three years. *See* 29 U.S.C. § 255(a). Willful violations occur when "the employer either knew or showed

reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Beyond the actual damages to cover the amount of unpaid minimum wages or overtime compensation, the FLSA allows additional recovery of "an equal amount of liquidated damages." 29 U.S.C. § 216(c). The Tenth Circuit has noted: "The purpose for the award of liquidated damages is 'the reality that the retention of a workman's pay may well result in damages too obscure and difficult of proof for estimate other than by liquidated damages.'" *Renfro v. Emporia*, 948 F.2d 1529, 1540 (10th Cir. 1991) (quoting *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 463 (D.C. Cir. 1976)). "If the employer can show that the conduct giving rise to the action to recover back pay was in good faith, and that the employer had reasonable grounds to believe the conduct was lawful, the court may refuse to award some or all liquidated damages …. All circuits that have considered the matter hold that the trial court may eliminate or reduce the award of liquidated damages only if the employer shows both that he acted in good faith and that he had reasonable grounds for believing that his actions did not violate the Act." *Corman*, 356 F. Supp. 3d at 1184–85 (quoting *Renfro*, 948 F.2d at 1540 (quoting *Doty v. Elias*, 733 F.2d 720, 725 (10th Cir. 1984))); *see Garcia v. Tyson Foods, Inc.*, 890 F.Supp.2d 1273, 1295 (D. Kan. 2012) ("While the employer must prove subjective good faith, it must also prove that its actions were objectively reasonable. If the employer meets that burden the court retains discretion whether to award liquidated damages.").

Plaintiffs have alleged that Defendants' violations of the FLSA and the NMMWA were neither reasonable nor in good faith, and there is nothing in the record to contradict these assertions. *See* (Doc. 104). As Defendants are in default and have failed to answer or otherwise respond to the Amended Complaint or comply with court orders, Defendants cannot carry their burden to prove that their violation of the FLSA was both in good faith and reasonable such that it would be

unfair to impose liquidated damages upon them. Furthermore, by failing to respond to Plaintiffs' Amended Complaint, Defendants have admitted all facts pleaded in the Amended Complaint, including that the overtime wage violations were willful. *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.").

Plaintiff Jordan Daigle and Opt-In Plaintiffs David Hughes and David Holguin each testified at the evidentiary hearing held February 27, 2025 in support of their respective damages claims. Each individual testified that all of the factual assertions contained in their respective Affidavits attached as exhibits to the Motions were true. Based upon this testimony, the Court recommends the following facts be found:

1.    Defendants' violations of the FLSA and the NMMWA were neither reasonable nor in good faith, and therefore Plaintiffs are entitled to recover liquidated damages in addition to unpaid wages.

2.    Daigle worked for Defendants and was paid at a day rate of $576.00 per day for a midnight-to-midnight shift, or $24.00 an hour.

3.    During Daigle's hitch, he was required to (and did) work every day of the week. There was typically a day shift and a night shift. Daigle would begin working when the previous shift was about to end. Daigle typically worked twelve (12) or more hours straight during his shift. In addition to his scheduled hours, Defendants also frequently required Daigle to continue working into the next shift or outside of his scheduled shift time. If there was a problem with a well site, or there was no coverage, Daigle would be required by Defendants to work before his assigned shift, and/or into the next shift.

4.    Based on Daigle's schedule set by Defendants, he typically worked over forty (40) hours each workweek. Depending on the day of the week his hitch started, Daigle typically worked twenty-four hours a day, seven days a week, or a total of 168 hours per week.

5.    In connection with Daigle's testimony Exhibit 1 was introduced into evidence, constituting invoices and payment records for Jordan Daigle submitted to Defendants showing Daigle's time sheets and work reports.

6.    Daigle is owed $121,672.00, comprised of $60,836.00 in unpaid overtime and $60,836.00 in liquidated damages. A summary of Daigle's damages was introduced into evidence as Exhibit 2.

7.    Hughes worked for Defendants and was paid a day rate of $650.00 per day. He was not paid any overtime.

8.    Exhibit 5, identified as the invoices and payment records for David Hughes, where introduced into evidence as Exhibit 5.

9.    Hughes was required to (and did) work every day of the week. There was typically a day shift and a night shift. Hughes would begin working when the previous shift was about to end. Hughes typically worked twelve (12) or more hours straight during his shift. In addition to his scheduled hours, Defendants also frequently required Hughes to continue working into the next shift or outside of his scheduled shift time. If there was a problem with a well site, or there was no coverage, Hughes would be required by Defendants to work before his assigned shift, and/or into the next shift.

10.    Based on Hughes schedule set by Defendants, he worked seven (7) days a week, twenty-four (24) hours a day. During the entirety of Hughes employment, he was only off a few

days. Hughes typically worked over forty (40) hours each workweek performing services for Defendants. Hughes typically worked 168 hours each week.

11.    Although Hughes regularly worked in excess of forty (40) hours per week, Defendants did not pay him the overtime premium for all hours worked in excess of forty (40) hours in a workweek.

12.    Hughes is owed $40,801.60, comprised of $20,400.80 in unpaid overtime and $20,400.80 liquidated damages. A summary of Hughes damages was introduced into evidence as Exhibit 6.

13.    Holguin worked for Defendants and was paid $22.00 an hour. Holguin was not paid any overtime.

14.    In connection with Holguin's testimony Exhibit 3 was introduced into evidence, constituting invoices and payment records for Jerome Holguin submitted to Defendants showing Holguin's time sheets and work reports.

15.    Holguin was required to (and did) work every day of the week. There was typically a day shift and a night shift. Holguin would begin working when the previous shift was about to end. Holguin typically worked twelve (12) or more hours straight during his shift. In addition to his scheduled hours, Defendants also frequently required Holguin to continue working into the next shift or outside of his scheduled shift time. If there was a problem with a well site, or there was no coverage, Holguin would be required by Defendants to work before his assigned shift, and/or into the next shift.

16.    Based on Holguin's schedule set by Defendants, he worked seven (7) days a week, twenty-four (24) hours a day. During the entirety of his employment, Holguin was only off a few

days. Holguin typically worked over forty (40) hours each workweek performing services for Defendants. Holguin typically worked l68 hours each week.

17.    Based on Holguin's schedule set by Defendants, he worked seven (7) days a week, twenty-four hours a day for a total of l68 hours each week.

18.    Holguin is owed $50,380.00, comprised of $25,190.00 in unpaid overtime and $25,190.00 liquidated damages. A summary of Holguin's damages was introduced into evidence as Exhibit 4.

The Court finds Plaintiffs' above testimony that they each worked seven days a week, twenty-four hours a day, for a total of l68 hours each week, credible under the facts established by the record and applicable law. The test for whether an employee's time constitutes working time is whether the time is spent predominantly for the employer's benefit or for the employee's." *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1116 (10th Cir. 1999) (internal quotation marks and citation omitted). "The Supreme Court has rejected the argument that Congress' intent in enacting the FLSA was to compensate employees 'for all actual work ... as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.'" *Corman*, 356 F. Supp. 3d at 1179 (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944)). As the Supreme Court explained:

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

*Armour & Co.*, 323 U.S. at 133.

Plaintiffs lived full-time on the work site. The testified that they worked twelve hour shifts and were "on call" the remaining twelve hours of the day. Under applicable law:

> An employee is on duty, and time spent on standby duty is hours of work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes.

5 C.F.R. § 551.431(a)(1).

The Court recommends that Plaintiffs be awarded overtime wages in the amounts to which each of them testified, based on a twenty-four hour per day, seven-day per week, work schedule.

### g.    Attorney's Fees and Costs

As Plaintiffs filed suit for violations of the FLSA, they are entitled to recover their reasonable attorney's fees and costs under the FLSA. *See* 29 U.S.C. § 216(b). Specifically, 29 U.S.C. § 216(b) authorizes an award of attorney's fees and costs to the prevailing plaintiffs in any proceedings to enforce the provisions of the FLSA. Under the FLSA, the award of attorney's fees is mandatory, and courts have long recognized that to achieve the remedial goal of the FLSA attorney's fees must be awarded. *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 249 (5th Cir. 2016). Awarding employees their attorney's fees is necessary to "provide an adequate economic incentive for private attorneys" to take FLSA cases and "thereby to ensure competent legal representation for legitimate claims." *Odil v. Evans*, No. 3:01-cv-00070, WL 3591962 at *3 (M.D. Ga. Dec. 30, 2005).

In support of the claim for attorney's fees and costs, Plaintiffs submitted the Affidavits of Clif Alexander, of which the Court took judicial notice. (Docs. 116-5 and 141-5). The Affidavits of Clif Alexander demonstrate that the firm of Anderson Alexander, PLLC has $63,165.00 in

attorney's fees and $5,143.39 in court costs invested representing Plaintiffs in this case. The Court finds these amounts were reasonably and necessarily incurred in obtaining this judgment against Defendants, and recommends that Plaintiffs be awarded their attorney's fees and court costs as declared in the Affidavit of Clif Alexander.

### III.    Conclusion

Based on the foregoing legal principles and proposed findings of fact, the Court recommends:

1.    That Plaintiff's Motions for Entry of Final Default Judgment (**Docs. 116, 141**) be **GRANTED.**

2.    That the Court enter a judgment against Defendants Turnco Enterprises, LLC and Daniel Robles, jointly and severally, in the total amount of **$281,161.99**, payable as follows:

a.    **$121,672.00** in unpaid wages, inclusive of liquidated damages, payable to Named Plaintiff Jordan Daigle;

b.    **$40,801.60** in unpaid wages, inclusive of liquidated damages, payable to Opt-In Plaintiff David Hughes;

c.    **$50,380.00** in unpaid wages, inclusive of liquidated damages, payable to Opt-In Plaintiff Jerome Holguin; and.

d.    **$63,165.00** in attorneys' fees, and **$5,143.39** in costs, payable to Plaintiffs.

3.    That Opt-In Plaintiff Lara be ordered to withdraw his consent.

This 7th day of March, 2025.

_____

KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE

**WITHIN FOURTEEN (14) DAYS AFTER A PARTY IS SERVED WITH A COPY OF THESE PROPOSED FINDINGS AND RECOMMENDED DISPOSITION, THAT PARTY MAY, PURSUANT TO 28 U.S.C. § 636(B)(1), FILE WRITTEN OBJECTIONS TO SUCH PROPOSED FINDINGS AND RECOMMENDED DISPOSITION. A PARTY MUST FILE ANY OBJECTIONS WITH THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO WITHIN THE FOURTEEN (14) DAY PERIOD ALLOWED IF THAT PARTY WANTS TO HAVE APPELLATE REVIEW OF THE PROPOSED FINDINGS AND RECOMMENDED DISPOSITION. IF NO OBJECTIONS ARE FILED, NO APPELLATE REVIEW WILL BE ALLOWED. PURSUANT TO FED. R. CIV. P. 72(B)(2), A PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE OBJECTIONS.**